UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ALBERTO GABRIEL HERNANDEZ,                          :

               Plaintiff,                          :          <u>OPINION AND ORDER</u>

    -v.-                                    :          04 Civ. 127 (GWG)

GPSDC (NEW YORK) INC., ADVANCED          :
HANDLING SYSTEMS, INC., PACIFIC
WESTEEL RACKING, INC., FALCON STEEL      :
CO., OLD NAVY INC., and THE GAP, INC.,

                               :

               Defendants.
------------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

<u>APPEARANCES</u>

James K. Greenberg
Greenberg, Greenberg & Guerrero, LLP
363 Seventh Avenue, Suite 400
New York, NY  10001
Attorney for Plaintiff

Gregory E. Walthall
Hoey, King, Toker & Epstein
55 Water Street, 28th Floor
New York, NY  10041
Attorney for Defendants GPSDC (New York), Inc., The Gap, Inc., and Old Navy, Inc.

Mark Yagerman
Smith Mazure Director Wilkins Young & Yagerman, P.C.
111 John Street
New York, NY  10038
Attorney for Defendant Advanced Handling Systems, Inc.

Charles E. O'Bryan
Miller & Associates, P.C.
1 Battery Park Plaza, 28th Floor
New York, NY  10004
Attorney for Defendant Pacific Westeel Racking, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ALBERTO GABRIEL HERNANDEZ,                        :

            Plaintiff,                        :        <u>OPINION AND ORDER</u>

   -v.-                                        :        04 Civ. 127 (GWG)

GPSDC (NEW YORK) INC., ADVANCED                :
HANDLING SYSTEMS, INC., PACIFIC
WESTEEL RACKING, INC., FALCON STEEL        :
CO., OLD NAVY INC., and THE GAP, INC.,

            Defendants.                        :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Alberto Gabriel Hernandez brings this diversity action against GPSDC (New

York), Inc.; Old Navy, Inc.; The Gap, Inc. (collectively, "the GAP"); Advanced Handling

Systems, Inc. ("Advanced Handling"); Pacific Westeel Racking, Inc. ("Pacific"); and Falcon

Steel Co. ("Falcon"). Hernandez alleges that the defendants' negligence and their violations of

New York's Labor Law caused him to fall at a construction site and sustain serious injuries.

Hernandez moves for summary judgment against defendants, pursuant to Fed. R. Civ. P. 56, on

the issue of liability. Advanced Handling and Pacific cross-move for summary judgment

dismissing all of Hernandez's claims. Pacific also moves for partial summary judgment

dismissing Hernandez's claim for lost wages and medical expenses (except to the extent that

such expenses may be incurred by Hernandez in his home country). Finally, the GAP cross-

moves for summary judgment dismissing Hernandez's complaint and moves to dismiss all cross

claims. As set forth below, the motions are granted in part and denied in part.

1

## I. BACKGROUND

### A. Facts

The following facts are undisputed unless otherwise stated. In May 2002, the GAP was upgrading a pick module at a distribution facility it owned at 110 Merritt Boulevard, in Fishkill, New York. See Rule 56.1 Statement, filed June 21, 2005 (Docket #34) ("Pl. 56.1(a)"), ¶¶ 1-2; Local Rule 56.1 Statement of Undisputed Facts, filed July 21, 2005 (Docket #39), refiled Aug. 26, 2005 (Docket #61) ("Advanced Handling 56.1(a)"), ¶ 2; Rule 51.6 [sic] Statement to Pacific Westeel Racking, Inc.'s Cross-Motion for Summary Judgment, filed July 28, 2005 (Docket #48) ("Pacific 56.1(a)"), ¶ 1. A pick module is a storage unit for boxes of clothing. See Lancaster Deposition, dated Jan. 27, 2005 ("Lancaster Dep.") (reproduced as Ex. D to Notice of Cross Motion, filed Aug. 16, 2005 (Docket #54) ("GAP Motion")), at 8. The GAP hired Advanced Handling "to coordinate the various trades" involved in the construction and installation of the pick module. Advanced Handling 56.1(a) ¶ 9; see also Defendant the GAP's Local Rule 56.1 Statement of Material Facts in Support of the GAP's Cross-Motion for Summary Judgment and Opposition to the Plaintiff's Motion for Summary Judgment ("GAP 56.1(a)") (annexed to GAP Motion), ¶ 1 (adopting the Rule 56.1 statements of Pacific and Advanced Handling).

Thereafter, Advanced Handling subcontracted the job to Pacific, which is in the business of manufacturing the "steel pallet racking frames" that are necessary to build a pick module. Pl. 56.1 ¶¶ 12-13. Pacific in turn retained Falcon to provide labor and supervision for the assembly and installation of the pick module in the GAP's warehouse. Pacific 56.1(a) ¶ 5. Falcon signed the contract for the job, and subcontracted the labor to Coast-to-Coast ("Coast"), which provided all of the laborers for the job, including Hernandez. See Pl. 56.1(a) ¶ 21; Advanced Handling

56.1(a) ¶¶ 17-19.  Prior to his accident, Hernandez was employed by Coast for one year at various sites throughout the United States.  Pacific 56.1(a) ¶ 9.  Hernandez "'is an illegal alien who possesses no documentation permitting him to work or live in the United States' and 'no application for legalization has ever been filed' by him."  Local Rule 56.1 Statement, filed July 28, 2005 (Docket #43) ("Pacific 56.1(a) II") (quoting Letter from James K. Greenberg to Counelors [sic], dated Mar. 23, 2005 (reproduced as Ex. 5 to Declaration on Liability, filed July 28, 2005 (Docket #51) ("O'Bryan Liability Decl."))).

Robert Lancaster was "project engineer" for Advanced Handling Systems in May 2002 when the incident took place.  Pl. 56.1(a) ¶ 6.  As project engineer, Lancaster scheduled, coordinated and oversaw the installation of the pick module.  See id. ¶ 7.  Lancaster would check on progress at the Fishkill site at approximately two-week intervals for one or two days.  Id. ¶ 10.  He "was the only person at the job site from Advanced Handling."  Advanced Handling 56.1(a) ¶ 10; accord Pl. 56.1(a) ¶ 9.  Pacific had no employees working at the Fishkill site regularly, but a Pacific employee – either Kevin O'Neill or Vince Cirillo – would drive to the site every two or three weeks to check the status of the project, find out if there were any beams needed, inspect the project, have a look at the "anchoring," and "make sure they [were] keeping up to the installation."  See O'Neill Deposition, dated Jan. 27, 2005 ("O'Neill Dep.") (reproduced as Ex. E to GAP Motion), at 8, 12; Pl. 56.1(a) ¶ 16; Pacific 56.1(a) ¶ 11.  Pacific provided the material for the job, Pacific 56.1(a) ¶ 4, and Eric Maas, a Coast employee, was

assigned as the supervisor in charge of the entire job crew at the site, Pl. 56.1(a) ¶¶ 22-23. Maas reported to O'Neill or Cirillo. See id. ¶ 24 (citing Lancaster Dep. at 137).[1]

The GAP employed Tony Alongi as the Campus Safety Manager in charge of managing workers' compensation, hazard abatement, and providing health and safety training. See Defendant GAP's Local Rule 56.1 Statement of Disputed Material Facts ("GAP 56.1(b)") (annexed to GAP Motion), ¶ 34; Pl. 56.1(a) ¶ 34. Alongi supplied the contractors with "guidelines to safety rules" ("GAP guidelines") for ongoing work at the site, and each contractor signed an acknowledgment of receipt of the GAP guidelines. Pl. 56.1(a) ¶¶ 25-26. The GAP also required that the contractors working at the site comply with the Occupational Safety and Health Administration's ("OSHA") regulations. See Materials Handling Equipment Agreement ("GAP-Advanced Contract") (reproduced as Ex. 1 to O'Bryan Liability Decl.), ¶ 29; see generally 29 U.S.C. § 655 (granting the Secretary of OSHA the power to promulgate regulations under the Occupational Safety and Health Act ("OSH Act")).[2]

According to Coast's President, Michael Kares, Coast supervisors were "OSHA certified." Kares Deposition, dated Jan. 31, 2005 ("Kares Dep.") (reproduced as Ex. G to GAP

---

[1]Pacific asserts that O'Neill and Cirillo were salesmen who were on site only "for purposes of following up on customer satisfaction," Pacific 56.1(a) ¶¶ 10-12, but the pages of O'Neill's deposition that are cited to by Pacific (pp. 8-9) do not support that assertion.

[2]Although Advanced Handling alleges Pacific contractually agreed to be responsible for safety, Advanced Handling 56.1(a) ¶ 15, the citation supposedly establishing this fact, Lancaster Dep. at 88, does not even mention Pacific. See also Plaintiff's Rule 56.1(b) Counterstatement to Defendant Advanced Handling, filed Oct. 3, 2005 (Docket #68) ("Pl. 56.1(b) Advanced Handling"), ¶ 15. Nonetheless, the contract between Advanced Handling and Pacific does say that Pacific would "take all reasonable or required safety precautions . . . for the safety of persons." Subcontractor Agreement, dated May 22, 2002 ("Advanced-Pacific Contract") (reproduced as Ex. 2 to O'Bryan Liability Decl.), ¶ 10.6.

Motion), at 18. OSHA rules require employers to provide a "personal fall arrest system" that is "rigged such that an employee can neither free fall more than 6 feet . . . , nor contact any lower level." 29 C.F.R. §§ 1926.502(a)(2), (d)(16)(iii). "Personal fall arrest system means a system used to arrest an employee in a fall from a working level. It consists of an anchorage, connectors, . . . or body harness and may include a lanyard, . . . lifeline, or suitable combinations of these." 29 C.F.R. § 1926.500(b). "Lanyard means a flexible line of rope, wire rope, or strap which generally has a connector at each end for connecting the . . . body harness to a . . . lifeline . . . or anchorage." Id. "Lifeline means a component consisting of a flexible line for connection to an anchorage at one end to hang vertically (vertical lifeline), or for connection to anchorages at both ends to stretch horizontally (horizontal lifeline), and which serves as a means for connecting other components of a personal fall arrest system to the anchorage." Id. "Anchorage means a secure point of attachment for lifelines [or] lanyards . . ." Id. Coast's general practice was to supply to its workers single lanyards with one hook on each end so that they were always "100 percent . . . tied-off" either to a rope (i.e., a lifeline) or a steel beam. See Kares Dep. at 18-19, 21-22.

The system in use at the Fishkill construction site included a single lanyard that hooked onto a body harness and an anchor. See Pl. 56.1(a) ¶ 92; Pacific Westeel Racking, Inc. Response to Rule 51.6 [sic] Statement, filed July 28, 2005 (Docket #46) ("Pacific 56.1(b)"), ¶ 92; Advanced Handling Systems' Response to Rule 56.1 Statement of Plaintiff, filed Sept. 16, 2005 (Docket #67) ("Advanced Handling 56.1(b)"), ¶ 92. However, according to O'Neill, "normally, there is a double lanyard system in place," and he thought the OSHA guidelines required two lanyards. O'Neill Dep. at 40. Lancaster testified "there are some GAP facilities that require [a]

two" lanyard system, but for this site there was "only one" because "they adopted the OSHA regulation which" he believed required only one. Lancaster Dep. at 106, 118. Kares testified that he did not know if OSHA requires dual lanyards, and he thought it "depends who you talk to." Kares Dep. at 22-23.

On May 14, 2002, Hernandez was working on the pick module at the construction site. Pl. 56.1(a) ¶ 62. At a height of approximately 32 feet, Hernandez remembers that he was laying down the pick module's flooring, which consisted of metal decking and wood boards. See Hernandez Deposition, dated Oct. 5, 2004 ("Hernandez Dep.") (reproduced as Ex. B to GAP Motion), at 44-47. The metal decking was corrugated and separated into approximately 20-foot pieces. The decking got "tech-screwed" into the beams through pre-drilled screw holes that held it in place, and the metal pieces overlapped by about six inches. See Lancaster Dep. at 119-22; Pl. 56.1(a) ¶ 64. The screws would go in approximately one in every four feet, where vertical beams were located. Lancaster Dep. at 122; Pl. 56.1(a) ¶ 65. Then, the wood boards were to be placed on top of the corrugated metal, and the top side of the wood had a "sheet of plastic" that became the floor once the wood was laid down. Hernandez Dep. at 46-47. Before he fell, Hernandez remembers that he was installing the laminated wood pieces on top of the corrugated metal sub-floor. Hernandez Dep. at 44-47. Lancaster, however, testified that Hernandez was laying down the corrugated metal. Lancaster Dep. at 88, 119, 123.[3]

---

[3]Hernandez's Rule 56.1 statement states that Hernandez was laying down the corrugated metal. Pl. 56.1 ¶ 63 (citing Lancaster Dep. 119, 123). However, this assertion contradicts Hernandez's testimony. Hernandez Dep. at 44.

While Hernandez was working on the flooring, he was wearing a harness and a lanyard provided to him for safety. See Advanced Systems 56.1(a) ¶¶ 24-25. The lanyard's hook on one of its ends attached to his harness; the other end was designed to hook onto an anchor (the horizontal steel frame rods, which were part of the pick module). Id. ¶ 26. The site also had vertical beams, which were steel uprights on the horizontal frames running vertically at intervals of approximately one every four feet. Pl. 56.1(a) ¶ 80; Pacific 56.1(b) ¶ 80; Advanced Handling 56.1(b) ¶ 80. Because of the vertical steel uprights, a worker would have to unhook and rehook the lanyard to the horizontal rods while moving every four feet. See Pl. 56.1(a) ¶ 81; Pacific 56.1(b) ¶ 81.

When Hernandez needed to move from location to location, he would unhook the line from the structure and then move with himself unhooked. Advanced Handling 56.1(a) ¶ 27; Pl. 56.1(b) Advanced Handling ¶ 27. At the time of the incident, Hernandez testified that he was in the process of moving to a new location. Hernandez Dep. 56-57. Hernandez cannot remember the moments before he fell or the exact location of his fall. The last thing Hernandez remembers before falling is that he was walking to another location while working. See Hernandez Dep. at 56-59. Hernandez now asserts that, while moving to the new location, he fell through holes in each of the first three levels of the pick module where a stairway was eventually supposed to be installed – apparently based on Lancaster and O'Neill's testimony that the stairway opening was the only hole directly above where Hernandez lay on the ground after the fall. See Pl. 56.1(a) ¶¶ 66-67, 84; Lancaster Dep. at 87-88, 139-141. Lancaster heard the accident when it happened, but neither he nor O'Neill actually saw it. Advanced Handling 56.1(a) ¶ 30; Lancaster Dep. 63-65; O'Neill Dep. at 35.

7

Kares, Coast's President, testified that if there is a stairwell opening and a worker is laying down decking near that opening, he would normally put a rope barrier or caution tape around the opening. Kares Dep. at 37-38. None of the defendants contend that a barrier was installed on the day Hernandez was injured. See, e.g., Memorandum of Law in Support of Pacific Westeel Structures, Inc. Reply Memorandum of Law in Support of Motion for Summary Judgment on Damages ("Pacific Reply Liability Mem."), dated Aug. 18, 2005, at 9-11.[4]

There is conflicting evidence as to whether Hernandez was using his lanyard properly. Although Hernandez does not recall how he fell to the ground, he does recall that he was using his lanyard by hooking and unhooking to move past the vertical beams and that before he fell, he had removed the lanyard from the "metal bar" – presumably the horizontal beam – in order to move to a different location. See Hernandez Dep. at 52-59. O'Neill was working at the construction site on the day of the incident, and he saw Hernandez on the ground after the fall. O'Neill Dep. 39-40. O'Neill remembers seeing that Hernandez was still wearing his harness and it had to be cut off of him. Id. at 50. Furthermore, O'Neill remembers seeing a single lanyard attached to Hernandez's harness when the harness was cut off of him while he was on the ground. Id. at 39-40.[5] However, according to Lancaster, Hernandez's lanyard was not secured

---

[4] Pacific mistakenly titled this brief, as well as another reply brief, see Pacific Westeel Structures, Inc.'s Reply Memorandum of Law in Support of Motion for Summary Judgment on Liability, dated Aug. 18, 2005 ("Pacific Reply Damages Mem."), with respect to their subject matters – that is, whether they relate to liability or damages. Thus, we use a short form citation based on the subject matters of these briefs rather than their titles.

[5] Advanced Handling asserts that O'Neill testified during his deposition that the "plaintiff's lanyard was attached to the structure but not to plaintiff's harness." Advanced Handling 56.1(a) ¶ 39 (citing O'Neill Dep. at 49). However, nothing in the referenced page of O'Neill's deposition supports such a conclusion. To the contrary, O'Neill testified, "I believe he had the lanyard attached to his harness, just one." O'Neill Dep. at 40.

to his harness after the fall, but rather he saw it secured to the steel framework of the tower's third tier with the unattached end hanging in the air. Lancaster Dep. at 71, 83, 138-39. Lancaster inspected Hernandez's lanyard after the accident, and concluded it could not have been hooked to Hernandez and the tower when he fell because the lanyard was not stretched in any way. Advanced Handling 56.1(a) ¶ 32; Pl. 56.1(b) Advanced Handling ¶ 32. O'Neill also concluded the lanyard was "unstretched and unbent," and that the harness was "not faulty" and was attached to Hernandez. O'Neill Dep. at 53; Advanced Handling 56.1(a) ¶¶ 40-41; Pl. 56.1(b) Advanced Handling ¶¶ 40-41.

Alongi heard about the accident on his two-way radio when he was en route to work. Advanced Handling 56.1(a) ¶ 34; Pl. 56.1(a) ¶ 70. GAP already had a loss prevention unit stationed on site. Advanced Handling 56.1(a) ¶ 4. When Alongi arrived, William Gonda, a certified EMT, was holding Hernandez's neck and a loss prevention officer was present. Pl. 56.1(a) ¶ 70. Thereafter, Alongi conducted an investigation by taking photographs of the site and the lanyard, and interviewing five to ten people. Id. ¶ 71. Based on the lack of scoring on the D-ring of the harness, which is the hook on the harness end of the lanyard, Alongi's investigation indicated that Hernandez did not have the lanyard attached to his harness at the time of the accident. Advanced Handling 56.1(a) ¶ 36; see Alongi Dep. at 50-52. Furthermore, Alongi testified that the "tie off" – presumably referring to the lanyard – was found on the fourth tier of the pick module. Advanced Handling 56.1(a) ¶ 37 (citing Alongi Dep. at 57); Pl. 56.1(b) Advanced Handling ¶ 37. However, Lancaster, O'Neill, and Hernandez assert that Hernandez was working on the third tier at the time of the accident. See Lancaster Dep. at 119; Pl. 56.1(a)

¶ 62; O'Neill Dep. at 33. The third tier is the fourth floor counting upwards from and including the ground floor. See O'Neill Dep. at 34.

B. Procedural History

1. Hernandez's Complaint

On January 8, 2004, Hernandez filed his complaint against defendants, and then amended it on April 22, 2004. See Complaint, filed January 8, 2004 (Docket #1); Amended Complaint, filed Apr. 22, 2004 (Docket #7). Hernandez sets forth four causes of action in his amended complaint: (1) defendants "were negligent, reckless and careless in that they violated their duty to" Hernandez; (2) by reason of their negligence, defendants "violated Section 200 of the Labor Law of the State of New York, and the Rules and Regulations enacted pursuant thereto," (3) by reason of their negligence, "defendants violated Section 240 of the Labor Law of the State of New York"; and (4) "defendants violated section 241(6) of the Labor Law of the State of New York, and the Rules and Regulations enacted pursuant thereto, including various sections of The New York Code of Rules and Regulations." Amended Complaint ¶¶ 46, 52, 56, 60.

2. Hernandez's Motion

On June 21, 2005, Hernandez moved for summary judgment on the issue of liability and filed papers in support of his motion. See Notice of Motion, filed June 21, 2005 (Docket #32) ("Pl. Motion"); Pl. 56.1(a); Affirmation of James K. Greenberg ("Greenberg Aff.") (annexed to Pl. Motion); Memorandum of Law, filed June 21, 2005 (Docket #33) ("Pl. Mem."); Affidavit of Joseph Cannizzo (annexed to Pl. Motion). However, the papers address only his third cause of action and certain New York Industrial Code Regulations, see Pl. Mem. at 4-5, thus indicating he

seeks summary judgment solely on the issue of liability under Labor Law §§ 240 and 241(6).

### 3. Advanced Handling's Motion

Advanced Handling cross-moved for summary judgment "dismissing all causes of action." Notice of Motion, filed July 21, 2005 (Docket #39), refiled Aug. 26, 2005 (Docket #56) ("Advanced Handling Motion"). Advanced Handling filed supporting papers as well. See Advanced Handling 56.1(a); Affirmation in Support ("Yagerman Aff. in Supp.") (annexed to Advanced Handling Motion); Memorandum of Law ("Advanced Handling Mem.") (annexed to Advanced Handling Motion). Advanced Handling also filed an affirmation by Yagerman in opposition to Hernandez's motion. Affirmation in Opposition, filed July 21, 2005 (Docket #38), refiled Aug. 26, 2005 (Docket #58). On September 16, 2005, Advanced Handling filed a Rule 56.1(b) statement in response to Hernandez's Rule 56.1(a) statement. Advanced Handling 56.1(b).

### 4. Pacific's Motions

Pacific made a cross-motion for summary judgment dismissing Hernandez's claims under Labor Law §§ 200, 240, and 241(6), as well as his claims under common law negligence, and filed supporting papers for its motion. Notice of Cross-Motion, filed July 28, 2005 (Docket #47) ("Pacific Motion I"); see Pacific 56.1(a); Memorandum of Law in Support of Pacific Westeel Racking Inc.'s Cross-Motion for Summary Judgment, filed July 28, 2005 (Docket #49) ("Pacific Liability Mem."); O'Bryan Liability Decl.

Pacific also filed a second motion, this time for partial summary judgment, dismissing in part Hernandez's lost wages and future medical expenses claim. Notice of Motion, filed July 28, 2005 (Docket #42) ("Pacific Motion II"). Pacific filed supporting papers for this motion as well.

<u>See</u> Declaration of Charles O'Bryan, filed July 28, 2005 (Docket #44) ("O'Bryan Damages

Decl."); Memorandum of Law in Support of Motion for Partial Summary Judgment Related to

Plaintiff's Claims for Loss of Wages and Future Medical Expenses, filed July 28, 2005 (Docket

#50) ("Pacific Damages Mem."); Pacific 56.1(a) II.  Additionally, Pacific filed a Rule 56.1(b)

statement and a memorandum of law in response to Hernandez's 56.1(a) statement.  <u>See</u> Pacific

56.1(b); Pacific Westeel Structures, Inc. Memorandum of Law in Opposition to Plaintiffs Motion

for Summary Judgment, filed July 28, 2005 (Docket #45) ("Pacific Opp. Mem.").

5.  <u>The GAP's Motion and Other Submissions by the Parties</u>

On August 4, 2005, Hernandez's attorney, James Greenberg, submitted an affirmation

along with a reply memorandum in response to Advanced Handling and Pacific's motions.  <u>See</u>

Affirmation in Opposition to the Defendants' Cross-Motions and In Further Support of the

Motion, filed Aug. 4, 2005 (Docket #52) ("Pl. Opp. Aff.");[6] Reply Memorandum and

Memorandum of Law in Opposition to the Cross-Motions of Defendants Pacific Westeel and

Advanced Handling, filed Aug. 4, 2005 (Docket #53) ("Pl. Opp. Mem.").  In those papers,

Hernandez included an argument that the GAP's failure to oppose his motion meant the motion

must be granted as to the GAP.  Pl. Opp. Aff. at 1.  On August 16, 2005, the GAP filed a cross-

motion seeking summary judgment dismissing Hernandez's complaint, dismissing all cross-

motions, and denying Hernandez's motion.  <u>See</u> GAP Motion; Declaration in Support of

Defendants' Cross-Motion for Summary Judgment and In Opposition to the Plaintiff's Motion

for Summary Judgment ("Walthall Decl.") (annexed to GAP Motion); Memorandum of Law in

---

[6]Hernandez's reply affirmation attached an unsworn statement from Eric Maas.  Because
it is inadmissible, the statement is not be considered on the instant motions.  <u>See</u> Fed. R. Civ. P.
56(e).

Support of Cross-Motion for Summary Judgment ("GAP Mem.") (annexed to GAP Motion); GAP 56.1(a); GAP 56.1(b).[7]

On August 18, 2005, Advanced Handling filed its reply to Hernandez's opposition papers. See Reply Affirmation to Plaintiff's Opposition and in Further Support of Defendant Advanced Handling System's Inc. [sic] Summary Judgment Motion, filed Aug. 18, 2005 (Docket #55), refiled on Aug. 26, 2005 (Docket #59) ("Yagerman Reply Aff."); Memorandum of Law in Support of Reply Affirmation, filed Aug. 18, 2005 (Docket #55), refiled on Aug. 26, 2005 (Docket #60) ("Advanced Handling Reply Mem.").

Pacific also submitted reply papers. See Pacific Reply Liability Mem.; Pacific Reply Damages Mem. In its reply, Pacific included a declaration of Charles O'Bryan, see Declaration of Charles E. O'Bryan, dated Aug. 18, 2005, which attached a supplemental affidavit by its expert, Leo Debobes, see Supplemental Affidavit of Leo J. Debobes, dated Aug. 15, 2005. Advanced Handling subsequently filed a declaration by Mark Yagerman on August 26, 2005, adopting and attaching Debobes' affidavit. Declaration, filed Aug. 26, 2005 (Docket #62) ("Yagerman Decl."). In response, on September 14, 2005, Hernandez filed a sur-reply and attached a supplemental affidavit of his expert. See Sur-Reply Memorandum, filed Sept. 14, 2005 (Docket #66) ("Pl. Sur-Reply Mem."); Sur-Reply Affirmation, filed Sept. 14, 2005 (Docket #65) ("Greenberg Sur-Reply Aff."); Supplemental Affidavit of Joseph C. Cannizzo (annexed to Greenberg Sur-Reply Aff.) ("Cannizzo Supp. Aff.").

---

[7]Hernandez later submitted Rule 56.1 statements opposing defendants Pacific and Advanced Handling's Rule 56.1 statements. See Pl. 56.1(b) Advanced Handling; Plaintiff's Rule 56.1 Counterstatment [sic] to Pacific Westeel, filed Oct. 3, 2005 (Docket #69) ("Pl. 56.1(b) Pacific").

## II.  APPLICABLE LAW

### A.  Standard of Review on Summary Judgment Motions

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw "all justifiable inferences" in favor of the non-moving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson, 477 U.S. at 256.  Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case."  Nebraska v.

Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247-48).

    B. Applicable State Labor Law Provisions

    Hernandez's suit is before the Court as a diversity action and thus state substantive law is applicable. See DeWeerth v. Baldinger, 38 F.3d 1266, 1272 (2d Cir. 1994) (in diversity cases, the federal courts are "bound to follow state law on any matter of substantive law") (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). A federal court exercising diversity jurisdiction must apply the choice of law principles of the forum state. Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487, 496-97 (1941); O'Connor v. Lee-Hy Paving Corp., 579 F.2d 194, 205 (2d Cir.), cert. denied, 439 U.S. 1034 (1978). "If conduct regulating rules are in conflict, New York law usually applies the law of the place of the tort." Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999). Here, New York was the site of the accident and the parties in their briefs have cited New York law, thus signaling their consent to its application. See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000).

    In New York, negligence actions require proof of four elements: "[1] the existence of a duty, [2] the breach of which [3] may be considered the proximate cause of [4] the damages suffered by the injured party." Becker v. Schwartz, 46 N.Y.2d 401, 410 (1978) (citations omitted and bracketing added). Under Labor Law §§ 200, 240(1), and 241(6), however, laborers performing construction work are afforded greater protection than under the common

law of negligence.  See generally Ross v. Curtis-Palmer Hydro-Elec. Co., 81 N.Y.2d 494 (1993).

We now discuss each relevant Labor Law provision.

    1.  New York State Labor Law § 240(1)

Labor Law § 240(1), often called the "scaffold law," governs "elevation-related safety measures," and imposes a statutory duty on owners, contractors, and their agents to make safety devices that provide "proper protection" available to their workers.  See Ross, 81 N.Y.2d at 500, 503.  Specifically, the statute provides that:

> All contractors and owners and their agents, . . . who contract for but do not direct or control the work, in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

Labor Law § 240(1).  "'Proper protection' requires that the device must be appropriately placed or erected so that it would have safeguarded the employee, and that the furnished device itself must be adequate to protect against the hazards entailed in the performance of a particular task to which the employee was assigned."  Conway v. State of New York Teachers' Retirement System, 141 A.D.2d 957, 958 (1988) (emphasis in original) (citations omitted).

To prevail under the statute, a plaintiff must establish not only a violation of the statute's requirements but also that the violation was a proximate cause of the injury.  See Panek v. County of Albany, 99 N.Y.2d 454, 457 (2003); Zimmer v. Chemung Co. Performing Arts, Inc., 65 N.Y.2d 513, 519 (1985); Cordeiro v. Shalco Investments, 297 A.D.2d 486, 488 (2002); see also Blake v. Neighborhood Hous. Servs. of N.Y. City, 1 N.Y.3d 280, 287 (2003) ("Violation of the statute alone is not enough; plaintiff [is] obligated to show that the violation

was a contributing cause of his fall.") (quoting <u>Mullen v. Zoebe, Inc.</u>, 86 N.Y.2d 135, 143 (1995).

Once a violation of the statute is established to have been a proximate cause of the injury, the statutory liability codified in § 240(1) is not diminished by a plaintiff's contributory fault. <u>See Blake</u>, 1 N.Y.3d at 287-288.  New York courts have construed the statute to impose "strict" or "absolute" liability, but not in the traditional meaning of those terms.  <u>See id.</u>  Instead, the statute "creates a liability that is strict, or absolute, in two senses": (1) the duty to provide proper protection is nondelegable, and "thus contractors and owners are liable under the statute whether or not they supervise or control the work," and (2) the plaintiff's negligence is not a defense to a violation of the statute.  <u>Cahill v. Triborough Bridge and Tunnel Authority</u>, 4 N.Y.3d 35, 39 (2004).

Although "plaintiff's own negligence does not furnish a defense," section 240(1) does not apply where a plaintiff is "recalcitrant."  <u>Cahill</u>, 4 N.Y.3d at 39.  In <u>Cahill</u>, the New York Court of Appeals held that "where an employer has made available adequate safety devices and an employee has been instructed to use them, the employee may not recover under . . . § 240(1) for injuries caused solely by his violation of those instructions, even though the instructions were given several weeks before the accident occurred."  <u>Id.</u> at 37.  In such a case, "[t]he controlling question . . . is . . . whether a jury could have found that [plaintiff's] own conduct, rather than any violation of . . . § 240(1) . . . was the sole proximate cause of [plaintiff's] accident."  <u>Id.</u> at 39-40.

The statute "is to be construed as liberally as may be for the accomplishment of the purpose for which it was framed."  <u>Ross</u>, 81 N.Y.2d at 500 (citations and internal punctuation

omitted). "The purpose of the statute is to protect workers and to impose the responsibility for safety practices on those best situated to bear that responsibility." Id. Nonetheless, if owners and contractors have provided a safe work place, they do not become "an insurer" of the worker. Blake, 1 N.Y.3d at 286. "The point of Labor Law § 240 (1) is to compel contractors and owners to comply with the law, not to penalize them when they have done so." Id.

### 2. New York State Labor Law § 200

Section 200 is the codification of the common law duty to maintain a safe work environment. Ross, 81 N.Y.2d at 505. The statute provides that construction sites must be "constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein . . . . All machinery, equipment, and devices in such places shall be so placed, operated, guarded, and lighted as to provide reasonable and adequate protection to all such persons." See Labor Law § 200(1). "[R]ecovery against the owner or general contractor [under § 200] cannot be had unless it is shown that the party to be charged exercised some supervisory control over the operation." Ross, 81 N.Y.2d at 505. Because Hernandez has not opposed defendants' motions for summary judgment dismissing his claims under Labor Law § 200, the applicability of this section need not be considered further.

### 3. New York State Labor Law § 241(6)

Section 241(6) requires "owners and contractors and their agents . . . to provide reasonable and adequate protection and safety to" workers on construction sites, Labor Law § 241(6), and to "comply with the specific safety rules and regulations promulgated by the Commissioner of the Department of Labor," Ross, 81 N.Y.2d at 501-502. Like § 240(1),

§ 241(6) is usually nondelegable and does not require a plaintiff to prove that owners or general contractors exercised supervision or control over the worksite.  Id.  However, contributory and comparative negligence may be asserted as defenses to claims under § 241(6).  Id. at 502 n.4.

While § 200 codifies the "general common-law principles governing landowners' duty to provide a safe workplace," the "specific positive commands" applicable to all contractors and owners are found in § 240(1) and § 241(1)-(5).  Ross, 81 N.Y.2d at 503.  Section 241(6) is a "hybrid" because it "reiterates the general common-law standard" and requires compliance with "specific detailed rules through the Labor Commissioner's rule-making authority."  Id.  In instances where the Labor Law promulgates a general duty of reasonable or adequate protection and safety, such a duty is delegable and applies only to parties with control and supervision over the work site.  Id.  On the other hand, where a provision requires specific conduct, the duty is nondelegable, id., and thus owners and contractors are held liable without regard to their control or supervision over the construction site.  The same distinction between general and specific duties applies to regulations promulgated under the Labor Law, not merely to provisions of the Labor Law itself.  Id.  The reasoning behind the distinction is that it "would seriously distort the scheme of liability for unsafe working conditions" to allow a plaintiff to use broad, "nonspecific regulatory standard[s] . . . against a nonsupervising owner or general contractor."  Id. at 504.

4. Scope of Agents' Liability Under §§ 240(1) and 241(6)

The text of §§ 240(1) and 241(6) applies generally to "all contractors and owners and their agents."  See Labor Law §§ 240(1), 241(6).  Although owners and contractors are liable under § 240(1) and sometimes under § 241(6) whether or not they supervise or control the work, see Cahill, 4 N.Y.3d at 39; Ross, 81 N.Y.2d at 503, agents are only liable if they supervise or

control the work, see Blake, 1 N.Y.3d at 293. "An agency relationship for purposes of section 240 (1) arises only when work is delegated to a third party who obtains the authority to supervise and control the job." Id. "Only upon obtaining the authority to supervise and control does the third party fall within the class of those having nondelegable liability as an 'agent' under sections 240 and 241." Russin v. Picciano & Son, 54 N.Y.2d 311, 318 (1981); see also Waters v. Patent Scaffold Co., 75 A.D.2d 744, 744 (1st Dep't 1980) (supplier exercising no supervision or control could not be liable under § 240(1)). There is an "apparent legislative policy determination that 'over-all compliance with safety standards would [best] be achieved by placing primary and inescapable responsibility on owners and general contractors rather than on their subcontractors' because of the former's greater interest in the project and often superior economic position." Cannon v. Putnam, 76 N.Y.2d 644, 649 (1990) (alteration in original) (citing Haimes v. New York Tel. Co., 46 N.Y.2d 132, 137 (1978)).

In sum, under Labor Law sections 200, 240, and 241, "liability cannot be assessed against a subcontractor who did not control [or supervise] the work that caused the plaintiff's injury." Zervos v. City of New York, 8 A.D.3d 477, 481 (2d Dep't 2004).

## III.  DISCUSSION

### A.  Claims Under New York Common Law Negligence and Labor Law § 200

All defendants have moved for summary judgment dismissing Hernandez's claims under Labor Law § 200 and New York common law negligence. See GAP Motion; Pacific Motion; Advanced Handling Motion. Hernandez has not opposed these motions. See Pl. Opp. Mem.; Pl. Opp. Aff. Accordingly, summary judgment dismissing the Amended Complaint's first and second causes of action is granted. See Nebraska, 507 U.S. at 590 (Where "the nonmoving party

bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case.") (quoting Celotex, 477 U.S. at 322 (internal quotation marks omitted) (alteration in original)).

B. Pacific's Duties Under the Labor Law Statutes

Pacific has moved for summary judgment dismissing the claims against it because it did not exercise supervision or control over the work site. See Pacific Motion I. Hernandez argues Pacific is liable because it "assumed the obligations of the owner and general contractor contractually." Pl. Opp. Mem. at 10.[8] Pacific contends that, although it was retained as a subcontractor, "its actual role was that of a material supplier as it did not provide any labor for the project . . . [and its] presence on the site was limited to visits once every two to three weeks by its project manager or by one of its salesmen." Pacific Opp. Mem. at 5. Thus, Pacific's argument that it was not a subcontractor exercising supervision and control over the work site appears to be based on the argument that it was a mere supplier of materials.

Subcontractors that exercise supervision and control over a work site can be held liable under Labor Law §§ 240(1) and 241(6). See Blake, 1 N.Y.3d at 293. Although §§ 240(1) and 241(6) can subject an owner or general contractor to liability "regardless of whether it has actually exercised supervision or control over the work," see Ross, 81 N.Y.2d at 500, 502-505, the same rule does not apply to subcontractors or agents, see Cannon, 76 N.Y.2d at 648-49; Blake, 1 N.Y.3d at 293. In order to be held liable as a subcontractor or an agent under sections 240(1) and 241(6), Pacific must have controlled or supervised the construction done on the work

---

[8]Hernandez mistakenly cites to Exhibit 1 of Pacific's moving papers, which is the GAP-Advanced contract. Presumably, he intended to refer to the Advanced-Pacific contract, which is Exhibit 2 of the O'Bryan Liability Declaration.

site.  See Blake, 1 N.Y.3d at 293; Cannon, 76 N.Y.2d at 649; see also Russin, 54 N.Y.2d at 318

("Only upon obtaining the authority to supervise and control does the third party fall within the

class of those having nondelegable liability as an 'agent' under sections 240 and 241.").  An

"independent supplier" that exercises no supervision or control is not liable under sections

240(1) or 241(6).  See Waters, 75 A.D.2d at 744 (finding no liability for an "independent

supplier who leased its product to a subcontractor and who, apart from the initial installation,

exercised no supervision or control" over the construction leading to the injury).

The question here is whether Pacific was a subcontractor that actually exercised

supervision and control over the work site.  Paragraph 10.1 of the Advanced-Pacific Contract

provides that Pacific "shall be bound to Advanced Handling . . . by the terms of this agreement

and of Contract Documents . . . [for] all the obligations and responsibilities which Advanced

Handling . . . , by those Documents, has toward the Owner [GAP]."  Advanced-Pacific Contract

¶ 10.1.  This clause imposed on Pacific all the responsibilities Advanced Handling had towards

the GAP.  In other words, Advanced Handling subcontracted to Pacific its responsibilities

towards the GAP.  There is even language in the Advanced-Pacific Contract referring to Pacific

as a subcontractor: "the subcontractor [Pacific] agrees to furnish all the necessary labor,

materials, equipment, tools, and services necessary to perform" the installation of the tower.

Advanced-Pacific Contract ¶ 1.1 (emphasis added).  Despite this language, Pacific maintains it

was only hired to supply materials, and "did not provide any labor for the project."  Pacific Opp.

Mem. at 5.  Based on the language of the Advanced-Pacific Contract, a reasonable jury certainly

could conclude that Pacific was hired as a subcontractor to install the entire pick module and was

not a mere supplier.

With respect to whether Pacific controlled or supervised the work on the construction site, there is conflicting evidence. On one hand, the Advanced-Pacific Contract did not explicitly require Pacific to control or supervise the work involved in the construction. See Advanced-Pacific Contract ¶ 1.1. Furthermore, Pacific hired Falcon to install the tower rather than perform the project on its own, Pl. 56.1 ¶ 14 ("Pacific Westeel hired Falcon Steel to install their product"); Pacific 56.1(b) ¶ 14. Indeed, Pacific had no employees working at the site regularly, and its only presence occurred when either O'Neill or Cirillo would drive to the site every two or three weeks to check the status of the project, find out if there were "any beams needed, . . . inspect the project, and make sure they [were] keeping up to the installation." O'Neill Dep. at 8.

On the other hand, there is evidence that Pacific did exercise supervision and control over the work performed at the site. For example, the Advanced-Pacific Contract stated that Pacific would "take all reasonable or required safety precautions . . . for the safety of persons." Advanced-Pacific Contract ¶ 10.6. Additionally, Lancaster testified that Pacific was retained not only to provide material for the installation of the pick module but also to hire the labor and perform the installation. See Lancaster Dep. at 22, 26. O'Neill even described himself as "project manager." O'Neill Dep. at 5-6, 12. As project manager, O'Neill quoted jobs, estimated costs, did the shop drawings, wrote purchase orders, made outside purchases, and drew up the blueprints. Id. at 6, 8. Although Lancaster was in charge of the construction site from Advanced Handling, Lancaster testified that the construction site's lead man from Coast, Maas, reported to Pacific through O'Neill. See Lancaster Dep. at 7, 137.

In sum, there is conflicting evidence as to whether Pacific exercised control or supervision over the construction site. Therefore, there is a genuine issue of material fact on the issue of Pacific's liability under Labor Law §§ 240(1) and 241(6), and Pacific's motion with respect to these statutes is denied.

C. Defendants' Liability Under § 240(1)[9]

The parties have cross-moved for summary judgment on the issue of defendants' liability under Labor Law § 240(1). Their motions will be addressed in turn.

1. Hernandez's Summary Judgment Motion

 Hernandez argues defendants violated § 240(1) by failing "to furnish appropriate personal safety devices such as a proper lanyard system and safety lines on which . . . Hernandez could tie off." Pl. Mem. at 7. He contends the single lanyard system was not adequate because it required laborers to lay decking at an elevation while hooking and unhooking their lanyards every four feet. Id. According to Hernandez, defendants should have used a dual lanyard system that would have allowed the workers to remain attached to the structure at all times, or alternatively, should have added a lifeline – that is, a rope – in the structure running "either down the sides or along the center line of the work area." Id.

In order to prevail, Hernandez must prove that defendants (1) violated the statute by failing to provide him with "adequate" safety devices, Conway, 141 A.D.2d at 958, and (2) that this failure was a "contributing [proximate] cause of his fall," Blake, 1 N.Y.3d at 288; Cahill, 4 N.Y.3d at 39. The so-called "recalcitrant worker defense" applies where the injured worker's

_____

[9]While we refer to the defendants collectively in this section, Pacific would be liable under §§ 240(1) and 241(6) only if a jury concludes it exercised supervision and control over the work site. See section III.B. above.

actions are the "sole cause" of the fall. Cahill, 4 N.Y.3d at 39. In other words, where a defendant's failure to provide adequate safety devices is a contributing proximate cause of the fall, that failure necessarily means that the worker's actions were not the "sole cause" of the fall and thus the "recalcitrant worker" defense would not apply in that situation. See id. at 39-40. Conversely, if a worker's actions are the sole cause of his injuries, it is impossible for a statutory violation to be a contributing proximate cause of those injuries. See Blake, 1 N.Y.3d at 290-291.

As to the first requirement for liability under § 240(1) – that is, a violation of the statute – we must determine whether the safety devices provided to Hernandez gave him adequate protection from the dangers he faced while laying down decking at an elevation. "The mere availability of any particular safety device will not provide a shield from absolute liability if that device alone is insufficient to provide safety without the use of additional precautionary devices or measures." Desrosiers v. Barry, Bette & Led Duke, Inc., 189 A.D.2d 947, 948 (3d Dep't 1993) (finding liability where defendants provided a lanyard and safety belt but plaintiff had no place "to anchor or affix the lanyard and thus make it operative") (citing Conway, 141 A.D.2d at 958-959). It is well-settled that "[t]he statutory duty is not satisfied merely because a safety device of one sort or another was made available to the injured employee at the work site . . . [T]he furnished device itself must be adequate to protect against the hazards entailed in the performance of the particular task to which the employee was assigned." Conway, 141 A.D.2d at 958 (emphasis in original).

This case is similar to Conway. In Conway, the court found "totally insufficient" a safety line that did not allow the worker to move from one point of installation to the next while attached. Here, it is undisputed that Hernandez was provided with a single lanyard system that

required Hernandez to hook and unhook every four feet, leaving him unprotected during this process.  See Lancaster Dep. at 72-73; Hernandez Dep. at 48-54; Pl. 56.1(a) ¶ 81; Pacific 56.1(b) ¶ 81; Advanced Handling 56.1(a) ¶ 27.  Still, defendants maintain that this single lanyard system provided adequate protection to Hernandez and satisfied their statutory obligations.  See Pacific Opp. Mem. at 6; Pacific Reply Liability Mem. at 5-6; Advanced Handling Mem. at 4, 7.

Notably, the Coast-to-Coast President testified that workers "should move from place to place without disconnecting" and that a dual lanyard system would have been appropriate under the circumstances to allow a worker to move while remaining continuously attached to an anchor.  See Kares Dep. at 46-47.  The Court agrees that a dual lanyard system was required here inasmuch as it would have allowed Hernandez to be attached to the structure at all times.  With such a system, Hernandez could have unhooked and rehooked one lanyard past a vertical beam while the second lanyard remained attached to the horizontal anchor, and then unhooked and rehooked the second lanyard past the vertical beam while the first lanyard remained attached to the anchor.  See id.  Similarly, a lifeline running across the work area would have allowed him to remain attached to a secondary line as he hooked and unhooked a lanyard past the vertical beams.  Id. at 47.

Additionally, the Court views the OSHA regulations, while not controlling, as helpful in determining whether defendants provided "proper protection," especially since the defendants contractually agreed to conform to OSHA standards.  See Armentano v. Broadway Mall Properties, Inc., 2005 WL 1330527, at *3 (N.Y. Sup. Ct. 2005) (citing to OSHA regulations and finding a violation under § 240(1)).  OSHA regulations do not require a double lanyard system or a single lanyard system with a lifeline, but they do state that employers "shall provide and

install all fall protection systems," 29 C.F.R. § 1926.502(a)(2), that are "rigged such that an employee can [not] free fall more than 6 feet," 29 C.F.R. § 1926.502(d)(16)(iii).  The fact that the single lanyard system here required the workers to hook and unhook while laying down decking means they necessarily were unattached at certain points.  At those points, a fall protection system was not rigged so that Hernandez would not "free fall more than 6 feet," id.

Our conclusion is buttressed by case law stating that § 240(1) should be construed broadly to effectuate its purpose of providing workers with the utmost safety.  See Blake, 1 N.Y.3d at 292; Ross, 81 N.Y.2d at 500; see also Wilson v. City of New York, 89 F.3d 32, 36 (2d Cir. 1996) (finding that the "purpose of [§ 240(1)] is to provide protection for workers who are subjected to elevation-related risks" and the statute must be construed "liberally").  Because Hernandez was laying down decking over an open floor at a dangerous height, he should have had the ability to connect to an anchor or a lifeline at all times.

While defendants have not suggested that such a system was impractical, it would not matter if it were since the unavailability of a safe system would not negate their liability.  See Zimmer v. Chemung County Performing Arts, Inc., 65 N.Y.2d 513, 524 (1985) ("[i]f the state of the building art is such that no devices have yet been devised to protect workers operating at such heights in dangerous work, it is illogical to conclude, given the purpose of the statute, that the responsibility of owners and contractors is then negated") (citations omitted and alteration in original).  In any event, it was indeed practical to provide Hernandez a dual lanyard system or a single lanyard system with a lifeline.  See, e.g., Kares Dep. at 46-47.  Instead, he was left unprotected at times, and thus the system available to him did not provide proper protection and was not "adequate to protect against the hazards entailed in the performance of the particular

task to which [Hernandez] was assigned," see Conway, 141 A.D.2d at 958 (emphasis in original).

Having concluded that the defendants failed to provide safety devices that properly protected Hernandez under Labor Law § 240(1), we next consider whether this violation was a contributing, proximate cause of Hernandez's injuries, since a "[v]iolation of the statute alone is not enough; plaintiff [is] obligated to show that the violation was a contributing cause of his fall." Duda v. John W. Rouse Const. Corp., 32 N.Y.2d 405, 410 (1973). Defendants argue the deficient lanyard system was not a contributing cause of Hernandez's injuries – relying on the so-called "recalcitrant worker" defense. See Advanced Handling Mem. at 6-7; Advanced Handling Reply Mem. at 1-7; GAP Mem.; Pacific Reply Liability Mem. at 4-9.

The recalcitrant worker defense applies where the injured worker was provided safety devices but fails to use them. That is, "an owner who has provided safety devices is not liable for failing to 'insist that a recalcitrant worker use the devices.'" Cahill, 4 N.Y.3d at 39-40 (quoting Smith v. Hooker Chems. & Plastics Corp., 89 A.D.2d 361, 365 (4th Dep't 1982)). For example, in Urias v. Orange County Agr. Soc., Inc., 7 A.D.3d 515 (2d Dep't 2004), a worker who was injured while climbing up a beam – instead of using the ladder provided for this purpose – was not permitted recovery under section 240(1). Id. at 516-17; see also Meade v. Rock-McGraw, Inc., 307 A.D.2d 156, 160 (1st Dep't 2003) (no violation to the extent defendant could show that the worker's "improper use" of the ladder provided was the sole cause of his injury).

Hernandez argues the recalcitrant worker defense is not available where there has been a violation and defendants have failed to provide proper protection. Pl. Opp. Mem. at 1-2. But the

recalcitrant worker defense is not so much a defense as it is a method of disproving the causation element of a § 240(1) claim.[10] As Cahill notes, "[t]he controlling question . . . is not whether plaintiff was 'recalcitrant,' but whether a jury could have found that his own conduct, rather than any violation . . . was the sole proximate cause of his accident." 4 N.Y.3d at 39-40. Thus, to avoid liability, it is not necessary for a defendant to show that the plaintiff deliberately refused available safety devices; rather, the only question is whether plaintiff's actions were the sole cause of the injury. Id. Therefore, the issue here is whether defendants' violation was a contributing proximate cause of Hernandez's injuries or Hernandez's own actions were the sole cause of his injuries. See Cahill, 4 N.Y.3d at 39-40.[11]

Hernandez cannot remember the moments before the fall. Hernandez Dep. at 58-59. There is evidence in the record, however, that at the moment he fell, Hernandez was wearing his

---

[10]Hernandez argues that if he has made out a prima facie case, then "the burden shifts to the defendant, who may defeat plaintiff's motion for summary judgment only if there is a plausible view of the evidence – enough to raise a fact question – that there was no statutory violation and that plaintiff's own acts or omissions were the sole cause of the accident." Pl. Opp. Mem. at 3 (quoting Blake, 1 N.Y.3d at 289 n.8). However, this burden shifting approach only applies in "cases involving ladders or scaffolds that collapse or malfunction for no apparent reason." Blake, 1 N.Y.3d at 289 n.8. There was no collapsed scaffolding or malfunctioning equipment here.

[11]In support of his argument, Hernandez cites to Peterson v. Barry, Bette & Led Duke, Inc., 171 Misc. 2d 346 (N.Y. Sup. Ct. 1996), see Pl. Opp. Mem. at 5-7, which held that where safety devices have "in fact been provided to the worker, a condition precedent to successful invocation of the [recalcitrant worker] defense is proof that the injured worker 'deliberately refused' to use the equipment [and] [i]f mere negligent omission is at least an equally probable inference . . . , the defense [of recalcitrance] must fail," Peterson, 171 Misc. 2d at 348-49. In light of the Court of Appeals decision in Cahill, however, this aspect of Peterson has been limited. That is, the recalcitrant worker defense does not require a deliberate refusal to follow instructions, and the workers' "own conduct" rather than "any violation" must be the sole proximate cause of the accident. See Cahill, 4 N.Y.3d at 39-40 (finding that the worker's actions constituted negligence and a jury could have found his negligence to be the sole cause of his injuries).

harness but was not connected to the tower by his lanyard. See, e.g., O'Neill Dep. at 39-40; Lancaster Dep. at 71, 138-39. It is undisputed that, after the fall, the hooks on Hernandez's safety equipment showed no scoring, Alongi Dep. at 50-52, and his lanyard was not stretched or ripped in any way, O'Neill Dep. at 53. Nor is there any evidence that the horizontal anchor broke during Hernandez's fall. Furthermore, the evidence presented shows that the lanyard, harness, and hooks did not malfunction in any way. O'Neill Dep. at 53; Hernandez Dep. at 54. Therefore, the only reasonable conclusion from the evidence submitted to the Court is that Hernandez fell freely from the tower, and thus that when he fell, his lanyard was not connected to either his harness or the anchor. In order to prevail in his motion, Hernandez must show that the single lanyard system was a proximate cause of his being disconnected from the tower when he fell – that is, that having to unhook and rehook every four feet was a proximate cause of his not being connected to the tower when he fell.

The evidence, however, is unclear as to how or why Hernandez became disconnected from the tower. Specifically, there is disputed testimony as to whether Hernandez unhooked the lanyard from his harness, the anchor, or both before he fell. He testified that he was using the single lanyard system properly by attaching and detaching the lanyard from the anchor to move around while he laid down decking. See Hernandez Dep. at 52-54. He also testified that at the time of the accident he had unhooked from the anchor to move to a different location. See id. at 57. O'Neill saw the lanyard attached to Hernandez's harness after the fall, O'Neill Dep. at 39-40, thus corroborating Hernandez's claim that he had unhooked his lanyard from the anchor at some point before he fell. On the other hand, Lancaster testified that Hernandez's lanyard was still hanging from the anchor after the fall. See Lancaster Dep. at 71, 83, 138-39. If a jury found

that the lanyard was hanging from the anchor after Hernandez fell, it would be reasonable to infer that Hernandez unhooked the lanyard from his harness at some point before he fell or never hooked it up to his harness at all. Such an action would be completely inconsistent with Hernandez's claim, see Hernandez Dep. at 52-57, that he was using the system properly and the fall occurred while he had unhooked from the anchor to move to another location. A jury presented with such evidence thus might reasonably conclude that Hernandez had not proved that the inadequate safety system provided by the defendants was a contributing cause to his fall. Rather, it might find that Hernandez failed to hook the lanyard to his own harness, that he had the ability to hook the lanyard to his harness prior to his fall, and that, had the lanyard been hooked to the harness, he would not have fallen. In other words, a reasonable jury might conclude that Hernandez's own actions were the sole cause of his injuries. See Cahill, 4 N.Y.3d at 39-40.

In sum, defendants are found to have violated § 240(1), and partial summary judgment on that issue is granted in favor of Hernandez. However, there is a genuine issue of material fact as to whether Hernandez's own actions were the sole cause of his injuries, and thus his motion for summary judgment on the issue of liability under § 240(1) is denied.[12]

## 2. Defendants' Motions for Summary Judgment

All defendants have cross-moved for summary judgment dismissing Hernandez's claim under § 240(1). See GAP Motion; Pacific Motion; Advanced Handling Motion. With respect to

---

[12]Hernandez argues for the first time in his opposition papers that "[t]he more proximate cause of the plaintiff's incident and injuries was the unsecured, uncovered and unguarded stairway opening in his work area." Pl. Opp. Mem. at 7. However, section 240(1) contains no specific requirement that hazardous openings be covered. It requires only that proper protection be given to workers.

the first element of § 240(1), a violation of the statute, we have already determined that the undisputed facts show that the lanyard system did not provide adequate protection. In our analysis of the second element, however, we determined that there were disputed issues of fact as to the cause of Hernandez's injuries. Viewing the facts in a light most favorable to Hernandez (the non-movant here), see Anderson, 477 U.S. at 255, a reasonable jury could conclude that Hernandez fell after unhooking his lanyard from the anchor to move to past a vertical beam and thus that the inadequate safety system was a proximate cause of his fall. Therefore, defendants' motions for summary judgment as to Hernandez's § 240(1) claim are denied.

D. Defendants' Liability Under § 241(6)

Hernandez has moved for summary judgment on his claim under section 241(6) and the defendants have cross-moved for summary judgment dismissing it.[13] As a basis for his cause of action under section 241(6), Hernandez argues that the defendants violated two provisions of the New York State Industrial Code ("Industrial Code"): § 23-1.7(b) and § 23-1.16(a)-(d). Pl. Mem. at 5. Industrial Code § 23-1.7(b)(1)(i) requires that "[e]very hazardous opening into which a

---

[13]Hernandez almost never mentions his fourth cause of action under section 241(6), see Amended Complaint ¶ 60, in his motion papers and never briefs how the facts here warrant relief under that statute. However, Hernandez moves for summary judgment on the broad issue of liability, discusses two Industrial Code regulations in his motion papers, and in his attorney's sur-reply affirmation, he requests "an Order granting Summary Judgment in his favor and against the defendants on the issue of absolute liability under Sections 240(1) and 241(6) of the New York State Labor Law." Greenberg's Sur-Reply Aff. at 3 (emphasis added). Although Pacific argues Hernandez failed to oppose its motion for summary judgment dismissing his claim under § 241(6), see Pacific Reply Liability Mem. at 13-14, it was sufficient that Hernandez argued that the defendants violated the Industrial Code regulations, see Greenberg's Sur-Reply Aff. at 3; Cannizzo Supp. Aff. ¶¶ 4-6; Pl. Mem. at 5. While Hernandez is to be faulted for never explicitly linking the alleged regulatory violations to his cause of action under Labor Law § 241(6), the Court will treat Hernandez's papers as if he had made such a link, since defendants were put on notice of the substance of this argument.

person may step or fall shall be guarded by a substantial cover fastened in place or by a safety railing constructed and installed in compliance with this Part."  Under the "pertinent part," Pl. Mem. at 5, of the second regulation, Industrial Code § 23-1.16(b)(1), "[e]very approved safety belt or harness . . . shall be properly attached either to a securely anchored tail line, directly to a securely anchored hanging lifeline or to a tail line attached to a securely anchored hanging lifeline."

"The interpretation of an Industrial Code regulation and determination as to whether a particular condition is within the scope of the regulation present questions of law for the court." Messina, 300 A.D.2d at 123.

### 1. Hernandez's Failure to Raise the Industrial Code Regulations in Interrogatories

There is some dispute in the case law as to whether or not section 241(6) is "self-executing."  Vernieri v. Empire Realty Co., 219 A.D.2d 593, 597 (2d Dep't 1995) (citing Long v. Forest-Fehlhaber, 55 N.Y.2d 154, 160 (1982)).  That is, some courts have held that "[b]ecause the statutory provision speaks only in the most general of terms, an action predicated upon Labor Law § 241 (6) must refer to a violation of the specific standards set forth in the implementing regulations (12 NYCRR part 23)."  Vernieri, 219 A.D.2d at 597 (internal quotation marks and citation omitted).  Others have held that "proof of a violation of a regulation is not necessary to sustain a section 241(6) cause of action since that section 'merely imposes vicarious liability on owners only where the predicate cause of action of common-law negligence exists against the contractor, subcontractor or employ[er] [and t]here is no need to show that a violation of administrative regulations occurred to establish a cause of action in negligence.'"  Leon v. J & M Peppe Realty Corp., 190 A.D.2d 400, 409-410 (1st Dep't 1993)

(alteration in original) (quoting <u>Nagel v. Metzger</u>, 103 A.D.2d 1, 7 (4th Dep't 1984)).

In keeping with the first point of view, Advanced Handling argues that Hernandez's failure to assert any violations of the Industrial Code in his responses to the defendants' interrogatories mandates dismissal of his section 241(6) claim. Advanced Handling Mem. at 10. At least one New York court has held that summary judgment dismissing a section 241(6) claim was warranted where the plaintiff failed to cite the Industrial Code provision that defendants allegedly violated. <u>See</u> <u>Katrakazos v. Frank Bahar, Inc.</u>, 297 A.D.2d 332, 333 (2d Dep't 2002).

It is uncontested that Hernandez failed to mention the Industrial Code violations in response to Advanced Handling's interrogatory seeking the "ordinances, regulations, and statutes" that plaintiff claims each defendant violated. Defendants' First Set of Interrogatories to Plaintiff (reproduced as Ex. A to Yagerman Reply Aff.), ¶ 16. In addition, Hernandez concedes that he "failed to serve amended interrogatories on defendant Advanced Handling Systems that pleaded the Industrial Code violations." Pl. Opp. Aff. ¶ 5. However, Hernandez did cite to the relevant Industrial Code regulations in his interrogatory responses furnished to Pacific, copies of which were sent to Advanced Handling. <u>See</u> Response to Defendant Pacific Westeel Racking, Inc.'s First Set of Interrogatories (reproduced as Ex. A to Pl. Opp. Aff.), ¶ 15. Additionally, Advanced Handling had further notice of the substance of Hernandez's § 241(6) claim because Hernandez cited to the Industrial Code regulations in his original brief on the motion, <u>see</u> Pl. Mem. at 5, and his expert cited to the same regulations in his affidavit, <u>see</u> Cannizo Aff. ¶ 4. Because Advanced Handling has not articulated any prejudice from Hernandez's failure to respond accurately to its interrogatories, the claims under the Industrial Code will be decided on the merits.

### 2. Industrial Code § 23-1.16(b)

As to § 23-1.16(b), Hernandez asserts this regulation was violated because he was not, as the regulation mandates, "attached either to a securely anchored tail line, directly to a securely anchored hanging lifeline or to a tail line attached to a securely anchored hanging lifeline." Industrial Code § 23-1.16(b); see generally Mills v. Niagara Mohawk Power Corp., 262 A.D.2d 901, 902 (3d Dep't 1999) (plaintiff's § 23-1.16(b) claim survived summary judgment where a safety belt was provided but was not "attached" and plaintiff injured himself from a fall). Defendants do not even address Hernandez's § 23-1.16(b) claim, let alone contest that they violated the provision. For the same reasons already discussed with respect to section 240(1), see section III.C.1.a. above, the defendants necessarily violated § 23-1.16(b) because there were times during the course of Hernandez's work when he could not be "attached."

However, a violation of an Industrial Code provision is "merely some evidence of negligence," see Ross, 81 N.Y.2d at 502 n.4, and establishes liability under Labor Law § 241(6) only if the violation was "the proximate cause" of the worker's injuries, Wilson, 89 F.3d at 38 (citing Ross, 81 N.Y.2d at 502). Summary judgment is not appropriate here because contributory and comparative negligence are valid defenses to a claim under section 241(6). Ross, 81 N.Y.2d at 502 n.4. As discussed earlier, there are genuine issues of material fact with respect to whether Hernandez's actions or the deficient lanyard system caused Hernandez to fall. Thus, the parties' motions with respect to the issue of liability under § 23-1.16(b) are denied, but Hernandez is entitled to partial summary judgment on the issue that § 23-1.16(b) was violated.

### 3. Industrial Code § 23-1.7(b)

The second Industrial Code regulation cited by Hernandez, § 23-1.7(b), states as follows:

> (b) Falling hazards. (1) Hazardous openings. (i) Every hazardous opening into which a person may step or fall shall be guarded by a substantial cover fastened in place or by a safety railing constructed and installed in compliance with this Part (rule). (ii) Where free access into such an opening is required by work in progress, a barrier or safety railing constructed and installed in compliance with this Part (rule) shall guard such opening and the means of free access to the opening shall be a substantial gate. Such gate shall swing in a direction away from the opening and shall be kept latched except for entry and exit. (iii) Where employees are required to work close to the edge of such an opening, such employees shall be protected as follows: (a) Two-inch planking . . . installed not more than one floor or 15 feet, whichever is less, beneath the opening; or (b) An approved life net installed not more than five feet beneath the opening; or (c) An approved safety belt with attached lifeline which is properly secured to a substantial fixed anchorage.

Industrial Code § 23-1.7(b). "As its heading reflects," the purpose of § 23-1.7(b) was to "establish[] rules for protections against 'falling hazards.'" <u>Messina</u>, 300 A.D.2d at 123.

None of the defendants dispute that the stairwell openings in fact lacked the requirement under § 23-1.7(b)(1) for a "substantial cover" over, or a "safety railing" around, a "hazardous opening." <u>See</u>, <u>e.g.</u>, Pacific Reply Liability Mem. at 9-11. But Pacific asserts that § 23-1.7(b)(1) does not apply because the opening through which Hernandez fell was not a "hazardous opening[]." <u>Id.</u> at 10. Pacific argues that the existence of the opening was "an intrinsic and unavoidable attribute to the task of installing a floor upon a bare steel frame structure." <u>Id.</u> at 11. Referring to this problem as a "chicken-egg conundrum," Pacific asks, "How can a worker install a floor cover without first violating a regulation which requires that floor covers be installed?"; the floor opening "could hardly be covered, gated, boarded, or railed pursuant to [§ 23-1.7(b)(i)] without first exposing a worker to the risks of an un-covered, ungated, un-boarded or un-railed space." <u>Id.</u> at 12. In other words, Pacific argues that it should not be liable for having an open floor because Hernandez was in the process of installing the floor when he was injured.

The Court recognizes the logical inconsistency addressed by Pacific.  But rather than conclude that an opening that exists as part of the process of building a floor is not a "hazardous opening," the Court believes the better interpretation would be to view subsection (b)(1)(iii) as allowing an alternative to the placement of the cover or railing contemplated by subsection (b)(1)(i).  Subsection (b)(1)(iii) mandates certain safety features for workers who "are required to work close to the edge of . . . an opening":  planking installed beneath the opening, a life net, or "[a]n approved safety belt with attached lifeline which is properly secured to a substantial fixed anchorage."

No party suggests that either of the first two of these was made available to Hernandez. Thus, the remaining question as to whether the statute was violated under this scenario is whether Hernandez had "[a]n approved safety belt with attached lifeline which is properly secured to a substantial fixed anchorage."  As already described, however, see section III.C.1.a. above, defendants did not have such a system for Hernandez insofar as Hernandez had to unhook and rehook his lanyard to the horizontal rods every four feet.  Therefore, defendants violated § 23-1.7(b)(1).

Hernandez is not entitled to summary judgment as to liability, however, because a violation of an Industrial Code provision is "merely some evidence of negligence," see Ross, 81 N.Y2d at 502 n.4, and establishes liability under Labor Law § 241(6) only if the violation was "the proximate cause" of the worker's injuries, Wilson, 89 F.3d at 38 (citing Ross, 81 N.Y.2d at 502).  Furthermore, section 241(6) permits a defendant to assert the worker's contributory negligence as a defense.  Ross, 81 N.Y.2d at 502 n.4.  As already discussed, there are disputed

issues of fact as to whether the deficient lanyard system provided to Hernandez was the cause of his injuries or Hernandez's own actions caused his injuries, see section III.C.1.a. above.

Accordingly, defendants' cross motions for summary judgment on the issue of liability under Industrial Code provision § 23-1.7(b) are denied. Partial summary judgment is granted on Hernandez's motion in that defendants violated § 23-1.7(b), and consequently Labor Law § 241(6).

E. Limitation of Damages

Defendants have moved for summary judgment on the issue of whether Hernandez's recovery of medical expenses should be restricted to the amount he could recover in his home country. See Pacific Damages Mem. at 2, 6; Yagerman Aff. in Supp. ¶ 55.[14] With respect to Hernandez's claim that he is entitled to his medical expenses incurred in the United States, defendants argue that the cases supporting limitation of lost wages earned by illegal aliens should be extended to medical expenses. See Pacific Damages Mem. at 6; Advanced Handling Mem. at 12-13.

Before the parties filed the instant motions, some New York case law had held that the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. § 1324a et seq., preempts state law to the extent a state permits an undocumented alien to recover compensation for lost illegal wages as an element of damages. See Sanango v. 200 East 16th Street Housing Corp., et al., 15 A.D.3d 36, 39-40 (1st Dep't 2004) (interpreting Hoffman Plastic Compounds, Inc. v. National

_____

[14]Defendants made the same argument with respect to lost wages, but Hernandez made clear that he was not seeking United States wages. Pl. Opp. Mem. at 10-11. Following briefing on the instant motion, however, Hernandez wrote a letter to the Court seeking to reinstate his claim for these wages. See Letter from James K. Greenberg to the Hon. Gabriel W. Gorenstein, dated Nov. 21, 2005. The Court will address this request with the parties at a conference.

Labor Relations Bd., 535 U.S. 137 (2002)); Balbuena v. IDR Realty LLC, 13 A.D.3d 285, 286 (1st Dep't 2004)). However, while this Court was considering the instant motions, the New York Court of Appeals squarely held to the contrary. See Balbuena v. IDR Realty LLC, 2006 WL 396944 (Ct. of App. of N.Y. Feb. 21, 2006). It is not necessary to determine whether this Court is bound by that decision because, even if IRCA preempted state law with respect to wages, there is no reason it would do so with respect to the recovery of medical expenses. As was discussed by the Supreme Court in Hoffman, the recovery of United States wages necessarily assumes that the alien would have engaged in new illegal acts to obtain these wages: specifically, his illegal employment. See Hoffman, 535 U.S. at 148-50. In the case of medical expenses, however, no new illegal act is required in order to incur such expenses. Notably, the defendant in Sanango recognized as much. See Sanango, 15 A.D.3d at 37 ("It is conceded that plaintiff is entitled, without regard to his immigration status, to recover damages for items such as pain and suffering and medical expenses."). Accordingly, defendants' motion to limit Hernandez's recovery of medical expenses is denied.

F. GAP's Summary Judgment Motion to Dismiss Cross-Claims

Although GAP submitted a notice of motion seeking to dismiss the cross claims of the other defendants, see GAP Motion, it did not brief the motion at all. Therefore, the motion is denied.

CONCLUSION

For the foregoing reasons, the parties' motions for summary judgment are granted in part and denied in part.

Specifically, Hernandez's motion for summary judgment on the issue of liability (Docket #32) is granted in part and denied in part. Defendants are found to have violated New York Labor Law §§ 240(1) and 241(6). In addition, they are liable for Hernandez's injuries to the extent that the lack of a "substantial cover" over, or "safety railing" around, the stairway openings on the first and second level of the pick module aggravated his injuries. However, a genuine issue of material fact exists as to the extent that Hernandez's injuries were caused by his own actions or by the statutory violations.

Defendants' cross-motions for summary judgment (Docket ## 47, 54, 56) dismissing Hernandez's claims are granted in part and denied in part. The motions are denied, except that Hernandez's first and second causes of action under common law negligence and Labor Law § 200 are dismissed. In addition, the GAP's motion seeking dismissal of cross-claims (Docket # 54) is denied.

Pacific's motion for partial summary judgment (Docket #42) on the issue of limiting Hernandez's recovery for medical expenses is denied.

SO ORDERED.

Dated: March 9, 2006
      New York, New York

_____

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

James K. Greenberg
Greenberg, Greenberg & Guerrero, LLP
363 Seventh Avenue, Suite 400
New York, NY  10001
Attorney for Plaintiff

Gregory E. Walthall
Hoey, King, Toker & Epstein
55 Water Street, 28th Floor
New York, NY  10041
Attorney for Defendants GPSDC (New York), Inc., The Gap, Inc., and Old Navy, Inc.

Mark Yagerman
Smith Mazure Director Wilkins Young & Yagerman, P.C.
111 John Street
New York, NY  10038
Attorney for Defendant Advanced Handling Systems, Inc.

Charles E. O'Bryan
Miller & Associates, P.C.
1 Battery Park Plaza, 28th Floor
New York, NY  10004
Attorney for Defendant Pacific Westeel Racking, Inc.

Specifically, Hernandez's motion for summary judgment on the issue of liability (Docket #32) is granted in part and denied in part. Defendants are found to have violated New York Labor Law §§ 240(1) and 241(6). In addition, they are liable for Hernandez's injuries to the extent that the lack of a "substantial cover" over, or "safety railing" around, the stairway openings on the first and second level of the pick module aggravated his injuries. However, a genuine issue of material fact exists as to the extent that Hernandez's injuries were caused by his own actions or by the statutory violations.

Defendants' cross-motions for summary judgment (Docket ## 47, 54, 56) dismissing Hernandez's claims are granted in part and denied in part. The motions are denied, except that Hernandez's first and second causes of action under common law negligence and Labor Law § 200 are dismissed. In addition, the GAP's motion seeking dismissal of cross-claims (Docket # 54) is denied.

Pacific's motion for partial summary judgment (Docket #42) on the issue of limiting Hernandez's recovery for medical expenses is denied.

SO ORDERED.

Dated: March 9, 2006
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

40